MJC/JKM2011R00645

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND SEP -3  A  9: 48

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No. ~~CAMR~~ 13-0457 |
| v. | : | |
| | : | **(Conspiracy to Commit Wire Fraud,)** |
| ROBERT M. FELDMAN, | : | 18 U.S.C. § 1349; Forfeiture, 18 |
| | : | U.S.C. § 982(a)(2)(A)) |
| Defendant. | : | |
| | : | |

...oOo...

## INFORMATION

## COUNT ONE

### (Conspiracy to Commit Wire Fraud)

The United States Attorney for the District of Maryland charges that:

### Relevant Persons and Entities

1.     At all times relevant to this Information, RICHARD SHUSTERMAN ("SHUSTERMAN") was a shareholder and president of International Portfolio, Inc. ("IPI"), a Delaware corporation that used the address of 200 Barr Harbor Drive, Suite 400, West Conshohocken, Pennsylvania.

2.     At all times relevant to this Information, IPI had a bank account ending in 3464 at Wilmington Trust of Pennsylvania, in Villanova, Pennsylvania.  SHUSERMAN was the sole signatory on the account.  IPI also had a bank account ending in 8364 at Bank of America, West Conshohocken, Pennsylvania.  SHUSTERMAN and **ROBERT M. FELDMAN** ("**FELDMAN**"), the defendant, were the signatories on the account.

3.     At all times relevant to this Information, **FELDMAN** was the sole shareholder and president of Delaware Valley Consulting, Inc., a Pennsylvania corporation with its office in Gladwyne, Pennsylvania.  The company had a bank account at Bryn Mawr Trust Company, Bryn

Mawr, Pennsylvania, and **FELDMAN** was a signatory on the account. **FELDMAN** was also the managing member and president of United Consulting, Inc. ("United Consulting"), a Pennsylvania corporation with a principal office in Gladwyne, Pennsylvania. Its bank accounts were held at Bryn Mawr Trust Company, Bryn Mawr, Pennsylvania, and **FELDMAN** was a signatory on the account. Pursuant to a joint venture agreement of June 21, 2006, **FELDMAN,** SHUSTERMAN, United Consulting and IPI were jointly engaged in the business of buying and selling consumer debt portfolios and medical debt portfolios. In 2009, **FELDMAN** exercised an option in the agreement to become a part-owner of IPI with SHUSTERMAN.

4.     At all times relevant to this Information, SHUSTERMAN and **FELDMAN** represented IPI to be a company with expertise and experience in the field of medical accounts receivable, including their purchase, valuation, collection, and resale.

5.     At all times relevant to this Information, JONATHAN E. ROSENBERG ("ROSENBERG"), and DOUGLAS A. KUBER ("KUBER"), were members and operators of Account Receivable Services, LLC ("ARS"), a Nevada limited liability company. ARS's principal office was located at 110 Greene Street, New York, New York. ARS had a bank account ending in 2214 at Commerce Bank, which later became TD Bank, in New York, New York. KUBER was the sole signatory on the account. ARS and its associated special purpose entities ("SPEs"), hereinafter collectively referred to as "ARS," were primarily involved in the business of investing in medical accounts receivable purchased from IPI using funds borrowed from investors interested in asset-based lending. The SPE bank accounts were also maintained at Commerce Bank, later TD Bank, in New York, New York.

6.     At all times relevant to this Information, ROSENBERG was the managing member and president of JER Receivables, LLC ("JER Receivables"), a New Jersey limited liability company located in Roseland, New Jersey. JER Receivables had a bank account ending

2

in 4039 at Bank of America, Roseland, New Jersey. ROSENBERG was a signatory on the account. ROSENBERG was also the managing member and president of International Portfolio Access, LLC ("IPA"), a New Jersey limited liability company located in Roseland, New Jersey. IPA had a bank account at PNC Bank, National Association, Philadelphia, Pennsylvania. JER Receivables and IPA were both primarily in the business of recruiting investors for medical accounts receivable portfolios purchased from IPI.

7.    At all times relevant to this Information, ROSENBERG and KUBER were members and operators of Portfolio Scope, LLC ("Portfolio Scope"), a Delaware limited liability company.  Portfolio Scope had a bank account ending in 0033 at Commerce Bank, later TD Bank, New York, New York.  KUBER was the sole signatory on the account.  Portfolio Scope was a shell company with no active business purpose.

8.    At all times relevant to this Information, Platinum Partners was an investment advisor and had its principal office in New York, New York.  Platinum Partners organized and managed several investment funds commonly referred to as hedge funds ("Platinum funds"). The Platinum funds were in the business of investing in high-yield investments and financial instruments.  The Platinum funds included the following: Platinum Credit Resources, LLC; Platinum Partners Value Arbitrage Fund, L.P. ("PPVA"); Centurion Credit Resources, LLC ("Centurion"); Level 3 Capital Fund, LP ("Level 3"); and Titanium Capital Partners, LLC ("Titanium"), hereinafter collectively referred to as "Platinum."

9.    At all times relevant to this Information, Roundstone Healthcare Investments, LLC, and Roundstone Healthcare Partners, LLC, both of Acton, Massachusetts, and associated entities, collectively referred to as "Roundstone," were private equity companies in the business of investing in medical accounts receivable portfolios purchased from IPI.

3

10.     At all times relevant to this Information, Greenfish Fund, LP, Greenfish 2, LP and associated entities, Delaware limited liability partnerships with principal offices located in Philadelphia, Pennsylvania, collectively referred to as "Greenfish," were private equity companies in the business of investing in medical accounts receivables purchased from IPI.

11.     At all times relevant to this Information, the International Institute of Tropical Agriculture ("IITA"), a non-governmental philanthropic organization, managed foreign aid and conducted research to develop solutions for hunger and poverty in Africa. IITA had its principal office in Ibadan, Oyo State, Nigeria. IITA invested part of its operating capital in certificates of deposit, money market shares and other conservative, liquid investments. IITA maintained a bank account ending in 8691 at Citibank, New York, New York.

a.      At all times relevant to this Information, IITA was governed by a Board of Trustees. D.L., a resident of West River, Maryland, was a member of the Board of Trustees and Chair of the Audit Committee. In those roles, D.L. reviewed short term investment opportunities for IITA's operating capital.  D.L. also directed his own personal investments, including investments in IPI debt portfolios.

## Background

### A.     IPI's Purchase of Medical Accounts Receivables from Hospitals

12.     On or about December 19, 2006, IPI paid approximately $5,720,029 to purchase approximately $1.874 billion in medical accounts receivable from Public Health Trust of Miami-Dade County, Florida, which operated Jackson Memorial Hospital in Miami, Florida, collectively referred to as JMH. The accounts receivable were comprised of approximately 1,244,203 in past due patient accounts that JMH had been unsuccessful in collecting.  In accordance with the Master Purchase Agreement, JMH provided IPI with data containing the patients' personal identifiers and payment histories.

4

     a.     After a dispute between IPI and JMH over the accounts receivable, an arbitration award dated December 19, 2008, required JMH to provide to IPI $360 million of accounts receivable by December 31, 2008. The arbitration award also required JMH to provide to IPI accounts receivable every month beginning in January 2009 of at least $10.4 million per month for two years.

     13.     On or about November 15, 2007, IPI received approximately $1.92 billion in medical accounts receivable from Hospital Management Associates ("HMA") in Naples, Florida, in exchange for approximately $18.75 million paid in installments by IPI. The accounts receivable were comprised of approximately 2,441,022 past due patient accounts that HMA had been unsuccessful in collecting. In accordance with the purchase agreement, HMA provided IPI with data containing the patients' personal identifiers and payment histories.

     a.     On or about December 23, 2008, IPI contracted to receive approximately $132 million more in medical accounts receivable from HMA, which were delivered on December 24, 2008. Under the terms of the agreement, HMA provided additional accounts receivable to IPI on May 6, 2009, August 12, 2009, and November 23, 2009.

     14.     On or about June 2, 2008, IPI paid approximately $1,250,253 to purchase approximately $175 million in medical accounts receivable from Multicare Health System ("Multicare"), Tacoma, Washington. The accounts receivable were comprised of approximately 187,289 past due patient accounts that Multicare had been unsuccessful in collecting. Multicare provided IPI with data containing the patients' personal identifiers and payment histories

## B.    The Promotion of the Medical Accounts Receivable Investment Model

     15.     Beginning in or about June of 2007, SHUSTERMAN, **FELDMAN,** ROSENBERG and KUBER began promoting an investment model to individual investors and investment fund managers that involved the sale and management of investment portfolios

containing medical accounts receivable acquired and managed by IPI, hereinafter referred to as "IPI debt portfolios." Investors were told that the IPI debt portfolios could achieve certain projected rates of return based upon the cash flow generated by two sources: (1) the collection of outstanding patient accounts receivable using various data analyses and debt collection strategies and (2) the resale of the IPI debt portfolios to purchasers in the debt-buying secondary market, such as large collection agencies or law firms specializing in debt collections.

16.     To implement the investment model, SHUSTERMAN, **FELDMAN**, ROSENBERG and KUBER agreed that SHUSTERMAN, through IPI, would batch accounts receivable from IPI's inventory into discrete debt portfolios with specified total outstanding account balances, which would then be offered for sale to investors. SHUSTERMAN, **FELDMAN**, ROSENBERG and KUBER also agreed that SHUSTERMAN, through IPI, would manage all the collection efforts for each debt portfolio IPI sold. Potential investors were told that the medical accounts receivable IPI purchased directly from hospitals where the debt was incurred had a higher collection potential than ones purchased from unrelated third-party debt buyers or servicers. Potential investors were also told that various analyses and collection strategies would be employed on their behalf to generate liquidation rates sufficient to readily meet the investor's cash flow benchmarks and establish the portfolio's potential resale value.

        a.      First, the debt portfolio would be analyzed to identify the nature and range of the patient accounts contained in the portfolio, referred to as data "stratifications."

        b.      Second, the debt portfolio would be "scrubbed" to remove uncollectible accounts, such as deceased and bankrupt debtor accounts, or to add needed collection information, such as a patient's missing social security number.

        c.      Third, IPI would place the portfolios for collections with its network of collection agencies in accordance with IPI's overall collection strategy.

d.      Fourth, the collection agencies would be required to wire the funds they collected directly into an investor's special purpose bank account ("SPE"), some of which were controlled and reviewed by independent escrow agents.

e.      Fifth, IPI would manage the collection process and track the funds collected and, if necessary, place the accounts with a different collection agency and/or employ different collection strategies.

f.      Finally, SHUSTERMAN, **FELDMAN**, ROSENBERG and KUBER would assist the investor in choosing the right time to sell the debt portfolio based upon demonstrated total collection activity and bids obtained from independent purchasers in the debt-buying industry.

17.      SHUSTERMAN, **FELDMAN**, ROSENBERG and KUBER represented that revenues from collections would come from two sources.

a.      The first source of collection revenues would come from the collection agencies engaged by IPI to liquidate the IPI debt portfolios. The collection agencies would wire the proceeds of their collection activity, minus their collection fee, into special purpose bank accounts opened by the investors.

b.      The second source of collection revenues would come from "direct payments." Direct payments are payments from former patients that are collected by hospitals after the patients' outstanding accounts have been sold to a third party. Hospitals usually aggregate such patient payments and forward them in a single payment to the party that purchased the patients' accounts. If that party sold the accounts receivable, they would have to forward the direct payments to the new purchaser. Consequently, it would not be unexpected for investors and/or their escrow agents to see direct payments from IPI being deposited into their SPE bank accounts. Indeed, part of the portfolio management service provided by IPI for each

7

of the debt portfolios sold to investors was to account for and reconcile the receipt of direct payments and then forward them to the investors' bank accounts.

## The Scheme and Artifice to Defraud

18.    From in or about March 2007 until in or about July 2010, in the District of Maryland and elsewhere, the defendant,

### ROBERT M. FELDMAN,

RICHARD SHUSTERMAN, JONATHAN E. ROSENBERG, and DOUGLAS A. KUBER, did knowingly devise and intend to devise a scheme and artifice to defraud investors and lenders in medical accounts receivable and to obtain money and property from such investors and lenders in excess of $275 million by means of materially false and fraudulent pretenses, representations, and promises ("the scheme to defraud").

## The Conspiracy to Defraud

19.    From in or about March 2007 until in or about July 2010, in the District of Maryland and elsewhere, the defendant,

### ROBERT M. FELDMAN,

RICHARD SHUSTERMAN, JONATHAN E. ROSENBERG, and DOUGLAS A. KUBER, did knowingly and willfully conspire, combine, confederate, and agree with each other, and other persons known and unknown to the Grand Jury, to commit wire fraud, that is, to knowingly execute and attempt to execute the scheme to defraud and for the purpose of executing and attempting to execute the scheme to defraud did knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce certain writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343 ("the conspiracy to defraud").

8

### Object of the Conspiracy

20.     The object of the conspiracy to defraud was for SHUSTERMAN, **FELDMAN**, ROSENBERG and KUBER to obtain money using materially, false, and fraudulent representations and omissions regarding purchase prices, collection results, and resale values of IPI medical debt portfolios in order to persuade investors to invest in those portfolios.

### Manner and Means of the Conspiracy

**A.      The Fraudulent Inflation of Purchase Prices for IPI Debt Portfolios to Obtain Larger Investor Loans**

21.     It was part of the conspiracy to defraud that SHUSTERMAN, ROSENBERG and KUBER inflated and caused to be inflated the purchase prices for IPI debt portfolios that ARS purchased with loan proceeds provided by Platinum, IITA, and other investors.

22.     It was further part of the conspiracy to defraud that SHUSTERMAN, ROSENBERG and KUBER, negotiated and agreed upon two different purchase prices for each IPI debt portfolio that Platinum and IITA financed on behalf of ARS: the actual purchase price that IPI charged ARS for its portfolios and the inflated purchase price that was communicated to Platinum, IITA and others.

23.     It was further part of the conspiracy to defraud that SHUSTERMAN, ROSENBERG and KUBER made and caused to be made fraudulent Purchase and Sale Agreements, Escrow Agreements, Collateral Security Agreements, Promissory Notes, and other documents, which reflected inflated purchase prices for IPI debt portfolios that were approximately 5% to 10% higher than the actual price ARS paid to IPI for those portfolios.

24.     It was further part of the conspiracy to defraud that SHUSTERMAN, ROSENBERG and KUBER artificially set higher purchase prices for the IPI debt portfolios ARS

financed through Platinum and IITA, because IPI agreed to kickback the loan proceeds in excess of the true purchase prices to ROSENBERG and KUBER through one of their other companies.

25.     It was further part of the conspiracy to defraud that once the Platinum and IITA loans were funded in the amount of the inflated purchase prices, ARS wired the loan proceeds to IPI's bank account.  IPI, in turn, wired between 5% and 10% of the loan proceeds back to ROSENBERG and KUBER using bank accounts belonging to other corporate entities owned by ROSENBERG and KUBER, including Portfolio Scope, LLC, which were beyond the scrutiny of the escrow agent and the established escrow procedures.

26.     It was further part of the conspiracy to defraud that, between in or about June 2007 and in or about March 2009, SHUSTERMAN, ROSENBERG and KUBER made or caused to made kickbacks of investor loan proceeds to ROSENBERG and KUBER in excess of $8 million.

**B.     The Fraudulent Inflation of Collection Results**

27.     It was part of the conspiracy to defraud that SHUSTERMAN, **FELDMAN**, ROSENBERG and KUBER, in order to induce existing investors to maintain and increase their participation in the investment scheme and to persuade new investors to join, falsely represented the actual amount of collections and rates of liquidation of IPI debt portfolios.

28.     It was further part of the conspiracy to defraud that, beginning in or about July 2008, SHUSTERMAN, **FELDMAN**, ROSENBERG and KUBER caused IPI to wire money to ARS to fund periodic interest payments that ARS owed Platinum and IITA in order to fraudulently conceal from Platinum, IITA and other investors the inability of IPI debt portfolios to generate sufficient collections to meet the minimum debt service payments due to Platinum and IITA, and to induce Platinum, IITA and other investors to make additional investments in the IPI debt portfolios.

29.     It was further part of the conspiracy to defraud that SHUSTERMAN, **FELDMAN**, ROSENBERG and KUBER created and caused to be created, between and among themselves, letters of understanding and loan agreements that recorded and tracked the amount of funds advanced by IPI to cover the periodic interest payments ARS owed to Platinum and to fund false collection deposits into the SPE's bank accounts (hereinafter "advances"), which documents and agreements were never made known to Platinum, IITA or the escrow agent for the ARS SPEs.  In accordance with those agreements, between in or about July 2008 and in or about December 2009, SHUSTERMAN, **FELDMAN**, ROSENBERG and KUBER caused approximately 212 advances to be wired into the SPE bank accounts of the various ARS debt portfolios, which advances were subsequently used to pay periodic interest payments due to Platinum and/or inflate the collection history of the respective Platinum and IITA debt portfolios.

30.     It was further part of the conspiracy to defraud that between in or about July 2008 and in or about March 2010, SHUSTERMAN, **FELDMAN**, ROSENBERG and KUBER falsely represented that IPI advances were a particular type of collection received during the liquidation of IPI debt portfolios called "direct payments."

a.     The co-conspirators falsely represented to Platinum and IITA that they were in compliance with escrow and collateral security agreements that required an accurate accounting of collections, including direct payments, which were deposited into the ARS SPE bank accounts created for each IPI debt portfolio ARS had purchased.

b.     Since IPI was the servicer of the medical accounts receivable and the party that purchased them from HMA, JMH, Multicare and other hospitals, the hospitals were required to forward their patients' direct payments to IPI, which was then required to forward them to the investors who had purchased the debt portfolios that contained the particular accounts receivable. On or about the dates when the periodic interest payments were due from ARS to Platinum,

SHUSTERMAN, **FELDMAN**, ROSENBERG and KUBER coordinated interstate wire transfers of the IPI advances into the ARS SPE bank accounts to falsely represent them as direct payments received from the hospitals and forwarded by IPI.

31.     It was further part of the conspiracy to defraud that SHUSTERMAN, **FELDMAN**, ROSENBERG and KUBER fraudulently used the pretense of direct payments being wired into the SPE accounts to give the false impression that collections were robust and on track to meet projected liquidation rates and/or investment benchmarks.

32.     It was further part of the conspiracy to defraud that SHUSTERMAN, ROSENBERG and KUBER, when wiring or causing the wiring of the advances into the SPE accounts, used odd numbers and skewed totals to conceal the true purpose of the advances and make them appear to be direct payments wired during the ordinary course of the collection process.

33.     Between in or about July 2008 and in or about March 2010, SHUSTERMAN, **FELDMAN**, ROSENBERG and KUBER made and caused to made false and misleading collection reports to deceive Platinum, IITA, and other investors by fraudulently inflating weekly collection totals by the amount of money IPI had advanced to ARS under the pretense of direct payments.  The inflated collection reports created the false impression that collections from IPI debt portfolios were much higher than they actually were.  In truth and fact, the actual collections for each of the ARS portfolios financed by Platinum and IITA were far below the projected liquidations for those portfolios.

34.     It was further part of the conspiracy to defraud that between in or about July 2008 and in or about March 2010, SHUSTERMAN, **FELDMAN**, ROSENBERG and KUBER falsely represented in weekly collection reports provided to Platinum and IITA that approximately

$56,180,158 in "direct payments" were collected during the liquidation of IPI debt portfolios financed by Platinum and IITA investors.

35.     It was further part of the conspiracy to defraud that in or about February 2009 SHUSTERMAN, **FELDMAN**, ROSENBERG and KUBER, in order to induce IITA to invest more money in the investment model, falsely represented in a weekly collection report provided to IITA that a wire transfer of approximately $2 million into IITA's SPE bank account was from collections, when, in truth and fact, it was an advance from IPI to give the false appearance that collections were on track to meet projected investment benchmarks.

36.     During the continued promotion, sale, and management of IPI debt portfolios, SHUSTERMAN, **FELDMAN**, ROSENBERG and KUBER failed to disclose to existing and potential investors the existence and necessity of the IPI "advances" to cover interest payments and inflate collection histories.

**C.     False Representations About Purported Resales of IPI Debt Portfolios to Purchasers in the Debt-Buying Secondary Market**

37.     It was part of the conspiracy to defraud that, notwithstanding the demonstrably poor liquidation rates of IPI debt portfolios and the use of IPI advances to subsidize ARS, SHUSTERMAN, **FELDMAN**, ROSENBERG and KUBER continued to promote the investment scheme to existing and potential investors by misrepresenting the collectability of the IPI debt portfolios and their potential resale value in the debt-buying industry, and by failing to disclose the poor collection results of previously purchased and managed IPI debt portfolios.

38.     It was further part of the conspiracy to defraud that SHUSTERMAN, **FELDMAN**, ROSENBERG and KUBER agreed to have IPI manage the liquidation process for each IPI debt portfolio sold to or financed by an investor and that at the time of the resale of the debt portfolio, IPI would serve as an intermediary purchaser and seller of the debt portfolio

13

ostensibly to protect IPI proprietorial information. As the intermediary, IPI would buy back the debt portfolio from the investor to whom it was originally sold and then purportedly solicit bids and sell it to third party purchasers in the debt-buying industry without either party knowing the identity of the other. In this way, SHUSTERMAN, **FELDMAN**, ROSENBERG and KUBER used IPI to artificially control both the sales and purchase price of the particular IPI debt portfolio being sold. In addition, investors were told that the resale value of the IPI debt portfolios would be based upon (1) the demonstrated total collection activity for the portfolio and (2) bids from new purchasers in the debt-buying secondary market.

39.     It was further part of the conspiracy to defraud that SHUSTERMAN, **FELDMAN**, ROSENBERG and KUBER, in order to induce investors to buy and/or maintain their investment positions in IPI debt portfolios, and to further conceal substantially lower than projected collection results, fraudulently repurchased and resold investors' IPI debt portfolios at artificially inflated prices that neither corresponded to a particular debt portfolio's actual collection results, nor to an asking price from a purchaser in the debt-buying industry. In truth and fact, none of the IPI's debt portfolios financed or purchased by Platinum, Roundstone, Greenfish, or IITA was ever sold to a third party in the debt-buying industry. For the portfolios that were falsely represented to have been sold to such third parties, the purchaser was actually another IPI investor or IPI itself.

40.     It was further part of the conspiracy to defraud that, as to IPI debt portfolios financed or purchased by Platinum, IITA, Roundstone, and Greenfish that were falsely represented to have been sold to purchasers in the debt-buying industry, SHUSTERMAN and **FELDMAN** sold them at prices higher than the investor's original purchase price or loan amount so as to create a contrived rate of return high enough to induce an existing investor to reinvest or a new investor to join the investment scheme.

41.    It was further part of the conspiracy to defraud that SHUSTERMAN, **FELDMAN**, ROSENBERG and KUBER represented to Platinum, Roundstone, Greenfish, IITA and other investors that the IPI debt portfolios sold to them or used as collateral for their loans were comprised of medical accounts receivable that IPI had purchased on the primary market, that is, the accounts had been purchased directly from hospitals and medical providers after those institutions had exhausted their efforts to collect from their debtor patients.  In truth and fact, SHUSTERMAN and **FELDMAN** intentionally and fraudulently sold to some investors IPI debt portfolios that IPI had repurchased from a different IPI investor.  SHUSTERMAN and **FELDMAN** at times re-sold portfolios which had been previously purchased from IPI by multiple investors.  SHUSTERMAN and **FELDMAN** failed to disclose to the new IPI investor the portfolio's collection history while owned by the previous IPI investors.

42.    To conceal poor collection results and the artificiality of the resale prices for IPI debt portfolios, and to assure a continuing flow of new funding into the investment scheme, SHUSTERMAN, **FELDMAN**, ROSENBERG and KUBER continued to solicit, and caused others to solicit, existing and prospective investors to purchase or finance IPI debt portfolios.  In so doing, SHUSTERMAN, **FELDMAN**, ROSENBERG and KUBER fraudulently used new investor funds to make interest and repurchase payments in order to meet the investment benchmarks of prior investors.

### Overt Acts

In furtherance of the conspiracy to defraud, and to effect the objects thereof, one of the co-conspirators committed or caused to be committed an overt act in the District of Maryland and elsewhere, including the following:

1.    On or about March 6, 2008, in reference to ARS's anticipated purchase of an IPI debt portfolio in the name of Portfolio One, LLC, to be financed by Platinum for the purported

purchase price of $29,249,627.29, SHUSTERMAN emailed ROSENBERG and KUBER telling them that the purchase agreement provided for "unqualified files at 6%" and their "refund" would be "limited to $1,746,000."

2.      On or about March 13, 2008, SHUSTERMAN wired or caused to be wired in interstate commerce $7,858,797.50 to Delaware Valley Consulting ("DVC"), representing FELDMAN's share of the proceeds from the sale of an IPI debt portfolio to ARS Portfolio One, LLC, for the purported price of $29,249,627.29.

3.      On or about May 31, 2008, KUBER emailed ROSENBERG saying, "By July 4th, we need an extra $4.5M. Then we need over $1M a month to pay ongoing interest. There is no way that is going to happen . . . We are fucked . . . the only way out is if Bob [FELDMAN] advances us $ which will never happen."

4.      On or about June 2, 2008, ROSENBERG emailed KUBER requesting a spreadsheet "for every single outstanding Platinum" deal setting forth dates and amounts of upcoming interest payments owed to Platinum investors.

5.      On or about June 27, 2008, SHUSTERMAN emailed FELDMAN asking him to get confirmation from Greenfish that it was willing to sell one of its IPI debt portfolios.

6.      On or about June 27, 2008, ROSENBERG and KUBER met in New Jersey to discuss an upcoming meeting with SHUSTERMAN and FELDMAN regarding the inability of the IPI debt portfolios to generate sufficient collections and the need for ARS to receive advances from IPI to cover upcoming interest payments due to Platinum investors.

7.      On or about July 2, 2008, SHUSTERMAN, FELDMAN, ROSENBERG and KUBER met together at a restaurant in Philadelphia and agreed that, in order to conceal from Platinum and other investors the negligible collections generated by the IPI debt portfolios, and to assure Platinum's continued participation in the investment scheme, SHUSTERMAN and

**FELDMAN** would advance money to ARS under the guise of "direct payments" to cover ARS's upcoming interest payments to Platinum, including $4.2 million due from ARS Titanium Holding, LLC.  At the meeting, SHUSTERMAN, **FELDMAN**, ROSENBERG and KUBER further agreed that ARS would repay IPI from the future sale of tranches of the Titanium portfolio.

8.     On or about July 7, 2008, ROSENBERG emailed SHUSTERMAN stating that if they showed Platinum that the investment scheme worked "as initially told to them and we pay the interest payment on time without selling a different file, *i.e.*, a direct payment, [KUBER] feels more than confident that he can . . . get additional sums in right away."

9.     On or about July 8, 2008, KUBER emailed ROSENBERG suggesting that SHUSTERMAN and **FELDMAN** should consider modifying the scheme to sell IPI debt portfolios by deemphasizing collections and using "flips" (sales of portfolios after short holding periods) unless IPI could guarantee ARS would make "some minimum profit" or be "subsidized by advances."

10.    On or about July 13, 2008, KUBER emailed SHUSTERMAN to confirm that the letter of agreement, regarding the $4.2 million advance from IPI to pay ARS's interest payment to Platinum, set forth "an odd amount, rather than even number," per SHUSTERMAN's suggestion.

11.    On or about July 16, 2008, SHUSTERMAN and **FELDMAN** wired or caused to be wired an advance of $4,200,102.50 from IPI's bank account to the SPE bank account of ARS Titanium Holding, LLC.

12.    On or about August 7, 2008, SHUSTERMAN caused an email to be sent to KUBER setting forth the schedule for the sale of Titanium tranches to pay back IPI's $4.2 million advance to ARS.

13.     On or about August 18, 2008, ROSENBERG emailed SHUSTERMAN (and later forwarded to **FELDMAN**) the dates when interest payments were due on four other ARS portfolios, as well as the year-to-date collection totals and liquidation rates, all of which were less than a tenth of the original projections.

14.     On or about August 26, 2008, ROSENBERG emailed **FELDMAN** letting him know that ARS would need assistance making an upcoming interest payment to Platinum unless there was "new money coming in from other investors."

15.     On or about September 14, 2008, SHUSTERMAN, **FELDMAN**, ROSENBERG, and KUBER caused to be sent an interstate and international email transmission from D.L. in West River, Maryland, to S.S. in Ibadan, Oyo State, Nigeria, regarding IITA's due diligence before investing in medical accounts receivable via ARS.

16.     On or about September 16, 2008, SHUSTERMAN, **FELDMAN**, ROSENBERG, and KUBER caused to be sent an interstate email transmission from D.L. in West River, Maryland, to KUBER in Livingston, New Jersey, requesting a letter of recommendation from Platinum vouching for its experience with investments in medical accounts receivable via ARS.

17.     On or about September 16, 2008, SHUSTERMAN, **FELDMAN**, ROSENBERG, and KUBER caused to be sent an interstate and international email transmission from D.L. in West River, Maryland, to S.S. in Ibadan, Oyo State, Nigeria, summarizing a meeting in New York City regarding IITA's proposed investment in medical accounts receivable via ARS.

18.     On or about September 16, 2008, KUBER emailed collection reports for an IPI debt portfolio to a trustee of the International Institute for Tropical Agriculture ("IITA") that included IPI advances as part of the total collections.

19.     On or about September 26, 2008, ROSENBERG emailed SHUSTERMAN suggesting a larger advance to create a cushion in the bank accounts for Portfolio One and Three

because the analysts at Platinum had been "going over these numbers on a monthly basis and have been breathing down [KUBER's] neck," and because "we are telling the investor that this is a direct pay, which is part of the liquidation – of course, we cannot tell them that we are having the money advanced – as the model that was presented to them shows that the liquidation should have easily covered their first interest payment as well as all future monthly interest payments." ROSENBERG further stated that "we cannot have the direct pay of the Advance, which the investor believes is a direct pay, precisely equal the exact amount owed in interest, as it would look contrived."

20.     On or about October 30, 2008, SHUSTERMAN and **FELDMAN** used an interstate wire transfer to wire $1,320,532.06 into the SPE bank account for Portfolio Four, and $4,385,643.49 into the SPE bank account for Portfolio Five.

21.     On or about November 10, 2008, SHUSTERMAN wired or caused to be wired $6,675,000 to the business bank account of Delaware Valley Consulting, representing **FELDMAN**'s share of $14.5 million that IPI received from the sale of debt portfolios to ARS Portfolio Thirteen, LLC, which was financed by IITA, and ARS Portfolio Fourteen, LLC, and ARS Portfolio Fifteen, LLC, both of which were financed by Platinum.

22.     On or about November 25, 2008, ROSENBERG sent an email to SHUSTERMAN (and later to **FELDMAN**) stating that the advance for Portfolio Six should be adjusted to take into account the fact that "we cannot have the direct pay (which is really the advance), which the investor believes is a direct pay from the hospital, precisely equal the exact amount owed in interest, as it would look contrived."

23.     On or about December 29, 2008, ROSENBERG emailed SHUSTERMAN and **FELDMAN** listing the amounts of the advances needed for December and stating that they were

19

the same as November's, however, "as these are considered Direct pays by the investor, we would like you to offset the numbers somewhat."

24.     On or about January 6, 2009, SHUSTERMAN emailed **FELDMAN** a flow chart to provide to Greenfish which summarized substantial annual rates of return in 2008 for IPI debt portfolios, including those of ARS and Roundstone, based solely on repurchases and resales, and claimed that "the sums listed do not include weekly collections which in some cases can average roughly 30% to 35% on the original purchase amount within a 12 month span. This sum must be added to the sale amount."

25.     On or about January 27, 2009, ROSENBERG emailed SHUSTERMAN and **FELDMAN** the information needed for the January advances and stating that KUBER "skewed the numbers between portfolios so that they would not appear to be exactly the same amount per portfolio as last month. This was done to show Platinum and their investors that these payments are the result of direct pays and not advances. Please note, however, that they equal the exact amount due to Platinum and not a penny more even though they are changed around between the portfolios."

26.     On or about February 27, 2009, SHUSTERMAN used an interstate wire transfer to transmit an advance of $2,085,473.25 to the SPE bank account for Slice 13, an IPI debt portfolio purchased by ARS with financing from IITA.

27.     On or about May 14, 2009, SHUSTERMAN, **FELDMAN**, ROSENBERG, and KUBER caused an interstate and international email transmission to be sent from D.L. in West River, Maryland, to S.S. in Ibadan, Oyo State, Nigeria, confirming the terms of IITA's proposed $5 million investment in an IPI debt portfolio via a loan to IPA.

28.     On or about May 22, 2009, SHUSTERMAN, **FELDMAN**, ROSENBERG, and KUBER caused an interstate and international email transmission to be sent from D.L. in West

River, Maryland, to S.S. in Ibadan, Oyo State, Nigeria, forwarding the closing documents for IITA's $5 million loan to IPA to purchase an IPI debt portfolio.

29.    On or about May 27, 2009, SHUSTERMAN, **FELDMAN**, ROSENBERG, and KUBER caused an interstate and international email transmission to be sent from D.L. in West River, Maryland, to S.S. in Ibadan, Oyo State, Nigeria, confirming IPA's receipt of a $5 million wire transfer from IITA's bank account for the purchase of an IPI debt portfolio.

30.    On or about July 9, 2009, SHUSTERMAN emailed **FELDMAN** a proposed response to an inquiry from a Roundstone investor which falsely stated that "[a]ll files sold to roundstone have been purchased directly from ipi from the hospitals we deal with within 60 days of a sale to roundstone."

31.    On or about July 29, 2009, KUBER emailed ROSENBERG to say if **FELDMAN** was "not going to give us any money for dp [direct payment] now, there is no reason to meet. It is all over. [Platinum] will go ballistic . . . and they will sue everybody and likely even report it."

32.    On or about August 24, 2009, ROSENBERG emailed KUBER to say that **FELDMAN** has "two friends who have agreed to put money in for the short-term flips. This money will be used to pay down a portion of the direct pay for August . . . and I am working on a few friends as well."


18 U.S.C. § 1349
18 U.S.C. § 2

**FORFEITURE**

The United States Attorney for the District of Maryland further charges that:

1.      Pursuant to 18 U.S.C. Section 981(a)(1)(C) and 28 U.S.C. Section 2461(c), upon conviction of an offense in violation of 18 U.S.C. § 1349, as alleged in Count One, the defendant shall forfeit to the United States of America all property, real and personal, which constitutes and is derived from proceeds traceable to the scheme to defraud.

2.      The property to be forfeited includes, but is not limited to, the following:

    a.      a 2009 Boston Whaler, Hull No. BWCE4066L809;
    b.      a 2010 Rolls Royce, VIN SCA664S51AUX48735; and
    c.      a sum of money equal to the value of the proceeds of the scheme to defraud, which amount is at least $278,105,193.

3.      If any of the property described above, as a result of any act or omission of the defendants:

    a.      cannot be located upon the exercise of due diligence;
    b.      has been transferred or sold to, or deposited with, a third party;
    c.      has been placed beyond the jurisdiction of the court;
    d.      has been substantially diminished in value; or
    e.      has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

18 U.S.C. § 981(a)(1)(C); 18 U.S.C. § 1956(c)(7); 18 U.S.C. § 1961(1); 28 U.S.C. § 2461(c); Rule 32.2(a), F.R.Crim.P.

_9/3/13_
Date

Rod J. Rosenstein
United States Attorney
District of Maryland