

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Northern Division*

| | | |
|---|---|---|
| *Rod J. Rosenstein*<br>*United States Attorney*<br><br>*Martin Clarke*<br>*Assistant United States Attorney* | *36 South Charles Street*<br>*Fourth Floor*<br>*Baltimore, Maryland 21201* | *DIRECT: 410-209-4840*<br>*MAIN: 410-209-4800*<br>*FAX: 410-962-3124*<br>*TTY/TDD: 410-962-4462*<br>*Marty.Clarke@usdoj.gov* |

**Via email attachment**

August 30, 2013

Henry E. Hockeimer, Jr.
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia PA  19103

Re:   *United States v. Robert M. Feldman*  (WDQ-13-0457)

Dear Mr. Hockeimer:

This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to Robert M. Feldman, the Defendant, by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by August 30, 2013, it will be deemed withdrawn. The terms of the agreement are as follows:

<u>Offense of Conviction</u>

1.       The Defendant agrees to waive prosecution by indictment pursuant to Federal Rule of Criminal Procedure 7(b) and to plead guilty to Count One of the Criminal Information charging him with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. The Defendant admits that he is, in fact, guilty of this offense and will so advise the Court.

<u>Elements of the Offense</u>

2.       The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

<u>Conspiracy to Commit Wire Fraud</u>

a.       The Defendant and at least one other person entered into an unlawful agreement;

b.       The purpose of the agreement was to knowingly execute or attempt to execute a



scheme or artifice to defraud and to obtain money or property by means of false or fraudulent pretenses, representations, or promises;

c.     An interstate or foreign wire was knowingly transmitted or caused to be transmitted for the purpose of executing the scheme to defraud; and

d.     The Defendant knowingly and willfully became a member of the conspiracy.

## Penalties

3.     The maximum sentence provided by statute for the offense to which the Defendant is pleading guilty is as follows: twenty years imprisonment, $250,000 fine or not more than the greater of twice the pecuniary gain or loss from the fraud, pursuant to 18 U.S.C. § 3571(d), and three years supervised release.  In addition, the Defendant must pay $100 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing.  This Court may also order him to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.[1]  If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise.  The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release.  The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

## Waiver of Rights

4.     The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

a.     The Defendant has the right to have his case presented to a Grand Jury, which would decide whether there is probable cause to return an Indictment against him.  By agreeing to proceed by way of Information, he is giving up that right, and he understands that the charges will be filed by the United States Attorney without the Grand Jury.

b.     If the Defendant pled not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel.  That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

c.     If the Defendant elected a jury trial, the jury would be composed of twelve

---

[1]     Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

    d.  If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

    e.  The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

    f.  If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

    g.  By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

    h.  If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

    i.  By pleading guilty, the Defendant waives any and all rights to have this case prosecuted within the time frame required by the applicable statute of limitations.

    j.  By pleading guilty, the Defendant will also be giving up certain valuable civil rights.

## Advisory Sentencing Guidelines Apply

    5.  The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28

U.S.C. §§ 991 through 998.  The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

Factual and Advisory Guidelines Stipulation

6.      This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto, which this Office would prove beyond a reasonable doubt, and to the following applicable sentencing guidelines factors:

a.      Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is seven (7).

b.      Pursuant to U.S.S.G. § 2B1.1(b)(1)(N), the base offense level is increased by twenty-six (26) levels because the loss was more than $100,000,000 but less than $200,000,000, resulting in an adjusted base offense level of thirty-three (33).

c.      Pursuant to U.S.S.G. § 3B1.2, the base offense level is decreased by three (3) levels because of the defendant's role in the offense relative to others, resulting in an adjusted offense level of thirty (30).

d.      This Office does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct.  This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's timely notification of his intention to plead guilty.  This Office may oppose *any* adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty.

7.      The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

8.      The Defendant reserves the right to oppose a two-level upward adjustment for sophisticated means pursuant to U.S.S.G. § 2B1.1(b)(10)(C).  With respect to all other calculations of the advisory guidelines range, this Office and the Defendant agree that no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute.  The Defendant reserves the right to argue for a variance pursuant to the factors set forth in 18 U.S.C. § 3553(a).  The parties further agree that if the evidence of the amount of loss at the time of sentencing is materially lower

4

than the amount of loss set forth in ¶6b, the Defendant shall be sentenced accordingly.

## Obligations of the United States Attorney's Office

9.      At the time of sentencing, this Office will recommend a sentence within the applicable guideline range.

10.      The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct.

## Forfeiture

11.      The Defendant agrees to consent to the entry of an order of forfeiture. By so doing, the Defendant understands that the court will, upon acceptance of his guilty plea, enter an order of forfeiture as part of his sentence, and that the order of forfeiture may include assets directly traceable to his offense, substitute assets and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense. Specifically, the court will order the forfeiture of any property, real or personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, from the violation of 18 U.S.C. § 1349, not to exceed $300,000,000. The parties agree and stipulate that any assets forfeited pursuant to the Consent Order of Forfeiture will be used to reduce the amount of restitution the Defendant is required to pay.

## Restitution

12.      The Defendant agrees to the entry of a Restitution Order for the full amount of the victims' losses of approximately $148,251,859. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and §§ 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. The Defendant further agrees that he will fully disclose to the probation officer and to the Court, subject to the penalty of perjury, all information, including but not limited to copies of all relevant bank and financial records, regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this plea agreement, and this Office may seek to be relieved of its obligations under this agreement.

## Collection of Financial Obligations

13.      The Defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the Defendant's ability to satisfy any financial obligation imposed by the Court. In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the Defendant agrees to disclose fully all assets in which the Defendant has any interest or over which the Defendant exercises control, directly or indirectly, including those held

5

by a spouse, nominee or other third party. The Defendant will promptly submit a completed financial statement to the United States Attorney's Office, in a form this Office prescribes and as it directs. The Defendant promises that the financial statement and disclosures will be complete, accurate and truthful, and understands that any willful falsehood on the financial statement will be a separate crime and may be punished under 18 U.S.C. § 1001 by an additional five years' incarceration and fine.

## Waiver of Appeal

14.     In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

a)     The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction;

b)     The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows: (i) the Defendant reserves the right to appeal any term of imprisonment to the extent that it exceeds the maximum term of imprisonment under the applicable guideline range; (ii) and this Office reserves the right to appeal any term of imprisonment to the extent that it is below the minimum period of imprisonment under the applicable guideline range.

c)     Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

d)     The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Obstruction or Other Violations of Law

15.     The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of

6

obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, or (iii) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

## Court Not a Party

16.      The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information. The Defendant understands that the Court is under no obligation to accept this Office's recommendations, and the Court has the power to impose a sentence up to and including the statutory maximum stated above. The Defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if the Court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, and will remain bound to fulfill all of his obligations under this agreement. The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

17.      This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Rod J. Rosenstein
United States Attorney

By: _____
Martin Clarke
Assistant United States Attorney

By: _____
Joyce McDonald
Assistant United States Attorney


I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

9/3/13
_____
Date

_____
Robert M. Feldman


I am Mr. Feldman's attorney. I have carefully reviewed every part of this agreement with him, including the Sealed Supplement. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

9/3/13
_____
Date

_____
Henry E. Hockeimer, Jr., Esq.

## Attachment A

## Statement of Facts

*The Defendant stipulates and agrees that if this case had proceeded to trial, the government would have proven the following facts beyond a reasonable doubt. The Defendant also stipulates and agrees that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

In late 2006, the defendant, Robert M. Feldman, and his business partner, Richard Shusterman, began promoting investments in credit card and medical accounts receivables. The defendant was the owner of Delaware Valley Consulting, Inc., and United Consulting, Inc., and Shusterman owned International Portfolio, Inc. ("IPI"). In early 2007, the defendant and Shusterman began to focus almost exclusively on the sale and promotion of medical accounts receivable that Shusterman had purchased from Jackson Memorial Hospital in Miami, Florida. Feldman's primary responsibilities in the venture were to solicit and develop new business relationships with investment fund managers and wealthy individuals who might be interested in investing in IPI's medical debt portfolios and to use his contacts at hospitals to acquire more medical accounts receivable. Shusterman's primary responsibility was to manage the debt portfolios.

Beginning in or about February 2007, the defendant and Shusterman entered into a business relationship with Jonathan Rosenberg and Douglas Kuber and their company, Accounts Receivable Services, LLC ("ARS"), in New York, New York, to promote the sale of IPI debt portfolios. Under the proposed venture, IPI would acquire accounts receivables from hospitals, bundle them into investment portfolios, and then sell the portfolios to ARS at an agreed upon discount rate. The money used to finance ARS's purchase of the medical debt portfolios from IPI would come from investors who agreed to lend money to ARS on a fixed-term basis in return for a high, fixed interest rate. As part of the purchase price paid to IPI by ARS, IPI agreed to oversee and administer the collection activity on the outstanding accounts in the portfolio. Any funds collected by IPI were to be forwarded to escrow accounts opened and maintained by ARS, which, in turn, would use the funds to cover the periodic interest payments and outstanding balances owed to the investors. The terms of ARS's repayment obligations were set forth in fixed-rate promissory notes and, at times, other agreements signed by the parties.

The defendant, Shusterman, Rosenberg and Kuber told investors that the IPI debt portfolios could achieve certain projected rates of return based upon the cash flow generated by the collection of outstanding patient accounts receivable using various data analyses and debt collection strategies. The portfolios would be placed with collection agencies, which would forward the collections to special purpose bank accounts created for the investors. Some collections on the accounts, known as direct payments, would be sent directly from the hospitals where the debt originated. The second source of cash flow could come from the resale of the IPI debt portfolios to purchasers in the debt-buying secondary market, such as large collection agencies or law firms specializing in debt collections.

A.     The Fraudulent Inflation of Purchase Prices for IPI Debt Portfolios to Obtain
       Larger Investor Loans

The defendant, Shusterman, Rosenberg and Kuber made or caused to be made material misrepresentations to investors about their investment model. In reliance on those misrepresentations, investors such as Platinum Partners and IITA provided loans to ARS of approximately $145,000,000 to purchase IPI debt portfolios, which IPI managed. Other investors, such as Roundstone and Greenfish, purchased approximately $122,500,000 worth of IPI debt portfolios directly from the defendant and Shusterman, which IPI also managed.

The first misrepresentation made to certain investors by Shusterman, Rosenberg and Kuber was that a loan secured by IPI debt portfolios would not be used to pay up-front fees and commissions associated with the investment offering. Kuber and Rosenberg represented to those investors that ARS would use 100% of the investor's loan proceeds to purchase the accounts receivable from IPI, and that ARS would only pay itself from collections or from the sale of the portfolio, **after** the interest promised to the investor was paid in full and **after** the investor's principal was returned. Indeed, ARS and IPI devised an elaborate process involving the use of multiple escrow accounts and independent accountants to feign a transparent tracking of the deposit of the loan proceeds, the revenue from collection activity, the repayment of interest, and the sale of portfolios.

In truth and fact, however, Shusterman agreed to provide Kuber and Rosenberg via ARS an upfront fee for each new investment loan used to purchase an IPI debt portfolio. It was further agreed that the funds to pay a 5% to 10% fee would come from the investor's loan

proceeds.  Pursuant to this undisclosed fee arrangement, ARS and IPI would calculate and agree to a secret purchase price for a debt portfolio.  Then they would tell the investor that the portfolio price was 5% to 10% higher than secret price.  In other words, ARS and IPI agreed to over-represent the value of the collateral pledged to the investor/lenders, thereby increasing the requested loan amount in order to use a portion of the loan proceeds to fulfill their pre-loan transactional fee arrangement.  ARS agreed to pay IPI's asking price for a particular portfolio, which was calculated by using a buy rate negotiated between ARS and IPI, and then the parties jointly agreed to increase that price by 5% to 10%, which would be kicked back by IPI to ARS. The net effect of this transactional fee arrangement, besides being an undisclosed and material conflict of interest, was that it falsely represented that the loans were 100% collateralized by the purported value of the accounts receivable.

IPI and ARS used a contractual provision in their Purchase Agreements called "Purchase Price Adjustment" to conceal this transactional fee arrangement.  IPI would routinely pay ARS the predetermined transactional fee under the guise of a "refund" or "rebate" for unqualified accounts.  To conceal the payment and receipt of the kickbacks, such "refunds" or "rebates" were not sent directly to ARS, but rather, were wired to one of ARS's subsidiaries, usually a company called Portfolio Scope.  The wire transactions were referenced as a "rebate," "advisory fee," or "consulting fee."  In so doing, ARS and IPI avoided the intricate escrow arrangement they had created to convince investors to finance the joint venture.  In sum, not only did the fraudulent use of the "Purchase Price Adjustment" provision provide cover for the undisclosed transactional fee arrangement between ARS and IPI, it also contravened the material promise made by ARS to the investors that ARS would not receive compensation from the investment offering until after the principal and interest on the loan was paid in full.

Between in or about June 2007 and continuing to until in or about March 2009, Shusterman, Rosenberg and Kuber made or caused to made kickbacks of investor loan proceeds to Rosenberg and Kuber totaling in excess of $8 million.

B.      The Fraudulent Inflation of Collection Results

To entice new investors to participate in the investment scheme, ARS and IPI falsely represented the amount of income being generated from the collection activity for the various medical debt portfolios.  Soon after defendant, Shusterman, Kuber and Rosenberg entered into

their relationship to promote the sale of IPI debt portfolios, it became apparent that collections were woefully inadequate, not only in their failure to cover periodic interest payments that ARS owed its investors, like Platinum and IITA, but also to repay the investors' principal.

Between approximately February and July 2008, the defendant, Shusterman, Kuber and Rosenberg discussed [deleted "various"] ways they could cover outstanding investment obligations without disclosing to current and potential investors the abysmal performance of collections coming from the collection agencies and directly from the hospitals. In July 2008, Feldman and Shusterman decided to use IPI to advance ARS the money needed to make ARS's periodic interest payments to Platinum and to IITA. Between in or about July 2008 and in or about December 2009, and without the knowledge of Platinum, IITA, the escrow agent for the ARS special purpose accounts, or any other investors, the defendant, Shusterman, Kuber and Rosenberg wired or caused to be wired approximately 209 advances from IPI into the SPE bank accounts of the various ARS debt portfolios, which advances were subsequently used to pay periodic interest payments due to Platinum and/or inflate the collection history of the respective Platinum and IITA debt portfolios.

Furthermore, the defendant, Shusterman, Kuber and Rosenberg agreed to conceal from Platinum and other investors the fact that the defendant and Shusterman were using the advances from IPI to subsidize ARS. To that end, the advances were represented as a particular type of collection received during the liquidation of IPI debt portfolios called "direct payments." When the defendant and Shusterman wired or caused to be wired funds from IPI into the SPE bank accounts, odd numbers and skewed totals were used to conceal the true purpose of the advances and to make them appear to be direct payments wired during the ordinary course of the collection process. Consequently, false and misleading collection reports were created to deceive Platinum, IITA because the weekly collection totals were inflated by the amount of money IPI had advanced to ARS under the pretense of direct payments. The inflated collection reports created the false impression that collections from IPI debt portfolios were much higher than they actually were. In truth and fact, the actual collections for each of the ARS portfolios financed by Platinum and IITA was far below the projected liquidations for those portfolios. Between in or about July 2008 and in or about March 2010, the defendant, Shusterman, Kuber and Rosenberg represented or caused to be represented in weekly collection reports provided to Platinum, IITA

4

and other investors that more than $56 million in "direct payments" were collected during the liquidation of IPI debt portfolios financed by Platinum and IITA investors.

C.      False Representations About Purported Resales of IPI Debt Portfolios to Purchasers in the Debt-Buying Secondary Market

During the continued promotion, sale, and management of IPI debt portfolios, the defendant, Shusterman, Kuber and Rosenberg failed to disclose to existing and potential investors the existence and necessity of the IPI advances that were used to cover interest payments and inflate collection histories. Subsequent to implementing their plan to subsidize ARS with monthly advances, Platinum was induced to fund the purchase of twelve more portfolios over four months, between July and November 2008 (Portfolios Slice 7-12 and 14-15), totaling approximately $65 million in new investments. And an IITA representative living in West River, Maryland, was induced to fund the purchase of Portfolio 13 on November 8, 2008 for $10 million and another portfolio via IPA on May 26, 2009 for $5 million. Also after implementing the new plan, Shusterman and Feldman negotiated the sale of thirty more portfolios to Roundstone over twenty-three months between August 2008 and July 2010 totaling approximately $51.3 million and ten more portfolios to Greenfish over fifteen months between July 2008 and October 2009 totaling approximately $25.75 million. And there were further sales of multiple portfolios through JER Receivables and other entities.

After investors purchased or lent money to purchase IPI debt portfolios, IPI oversaw the collection process and made recommendations about when to sell them. IPI purportedly solicited bids from potential purchasers in the debt-buying industry, and IPI served as an intermediary between the investor and the new purchaser, ostensibly to protect IPI proprietorial information. In this way, the defendant and Shusterman controlled both the sales and purchase price of the particular IPI debt portfolio being sold. The investors were told that the resale value of the IPI debt portfolios would be based upon (1) the demonstrated total collection activity for the portfolio and (2) bids from new purchasers in the debt-buying secondary market.

To induce investors to buy and/or maintain their investment positions in IPI debt portfolios, and to further conceal substantially lower than projected collection results, IPI fraudulently repurchased and resold to investors' IPI debt portfolios at artificially inflated prices that neither corresponded to a particular debt portfolio's actual collection results, nor to an

asking price from a purchaser in the debt-buying industry. In truth and fact, none of IPI's debt portfolios financed or purchased by Platinum, Roundstone, Greenfish, or IITA was ever sold to a third party in the debt-buying industry. For the portfolios that were falsely represented to have been sold to such third parties, the purchaser was actually another IPI investor or IPI itself, and the portfolios were almost always sold at prices higher than what the investor originally paid so as to create a contrived rate of return high enough to induce an existing investor to reinvest or a new investor to join the investment scheme.

The defendant, Shusterman, Kuber and Rosenberg represented to their respective investors that the IPI debt portfolios sold to them or used as collateral were comprised of medical accounts receivable that IPI had purchased [deleted "on the primary market, that is, the accounts had been purchased"] directly from hospitals and medical providers after those institutions had exhausted their efforts to collect from their debtor patients. In truth and fact, the defendant and Shusterman intentionally and fraudulently sold to some investors IPI debt portfolios that IPI had repurchased from an earlier IPI investor and sometimes multiple investors. For example, beginning in September 2008, IPI arranged for the sale of three tranches of the ARS Titanium portfolio financed by Platinum to be sold for a profit to Roundstone, then about a month later, two of those same tranches re-purchased by IPI and were sold for a profit back to ARS as Slice Ten-- using new Platinum financing. These tranches were a part of the original Titanium portfolio that required a $4.2 million advance to meet interest payments about two months earlier.

To conceal poor collection results and the artificiality of the resale prices for IPI debt portfolios, and to assure a continuing flow of new funding into the investment scheme, the defendant, Shusterman, Kuber and Rosenberg continued to solicit, and caused others to solicit, existing and prospective investors to purchase or finance IPI debt portfolios. In so doing, they fraudulently used new investor funds to make interest and resale payments in order to meet the investment benchmarks of prior investors.

In furtherance of all of the IPI debt portfolio transactions discussed above, interstate and foreign emails and wire transfers were transmitted, including transmissions from and to the District of Maryland.

---

I have read this statement of facts and carefully reviewed it with my attorney.  I agree that the United States could prove these facts at trial and that I am guilty of the conduct described herein.

9/3/13
Date

Robert M. Feldman

9/3/13
Date

Henry E. Hockeimer, Jr., Esquire

7